# UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

UNIVERSAL TECHNOLOGIES,
INC., and JESSE E. ROGERS,

       Plaintiffs,

VS.

FAYE CLEEK, CARLA BEAN,
NICHOLAS BEAN, GAYE
LAWDERMILK, CYNTHIA
MATLOCK, UNIVERSAL
SERVICES & SUPPLY, ARAIZA
and ARAIZA COMPANY, LLC,

       Defendants.

Case No.

**JURY DEMAND**

## COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DECLARATORY RELIEF

Come now Plaintiffs, Universal Technologies, Inc., and Jesse E. Rogers, and files this Complaint for Damages, Injunctive Relief and Declaratory Relief against Faye Cleek, Carla Bean, Nicholas Bean, Gaye Lawdermilk, Cynthia Matlock, Universal Services & Supply, ARAIZA and ARAIZA Company, LLC, and for their causes of action against these Defendants state as follows:

## NATURE OF CASE

(1)    This cause of action is predicated upon theories of Civil RICO, Theft, Embezzlement, Fraud and Conspiracy against all Defendants and includes claims for Breach of Fiduciary Duty and Intentional Interference with Business or Contractual Relations as to

1

Defendants, Faye Cleek ("Cleek") and Carla Bean ("Bean"). A claim for Declaratory Relief is further brought against Defendant Cleek.

(2)     At the core, this case involves a complex, long term RICO scheme orchestrated by Cleek involving multiple individuals and businesses structured by Cleek to embezzle millions of dollars from Plaintiffs (Universal Technologies, Inc., and its 72 year-old owner, Mr. Rogers) to benefit herself, her business (ARAIZA), her daughter (Carla Bean), her grandchildren (Nicolas and Kirsten Bean), her sister (Gaye Lawdermilk) and her sister's business (Universal Services & Supply) to the determinant of Plaintiffs.

(3)     Universal Technologies, Inc., ("UTI") is a defense and government contractor specializing in the design and manufacture of high-tech component parts for missiles, aircraft, helicopters and Navy vessels. Mr. Rogers is the founder and sole owner of UTI. Cleek and/or her daughter, Bean, were entrusted to handle UTI's books and financials since 1974. Cleek and Bean, however, embezzled millions of dollars from UTI and Mr. Rogers through the use of forgery, fraud, bank fraud, forged Powers of Attorney ("POAs"), fake or falsified invoices, payroll fraud and a scheme utilizing multiple individuals and companies. See (Exhibit 1) (Forged POAs and expert analysis of POAs by Jane Eakes); (Exhibit 2) (Forged POAs and expert analysis of POAs by Emily Will). Cleek also forged entries in UTI's corporate minute book in an effort to steal 25 % of UTI from Mr. Rogers who is seventy-two (72) years-old and in poor health. See (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes); (Exhibit 2) (Forged Minute Book entry and expert analysis of entries by Emily Will).

2

(4) Discovery of ten (10) unauthorized and fraudulently opened bank accounts at Putnam 1st Mercantile Bank in Cookeville, Tennessee, resulted in Mr. Rogers' suspicions that Cleek and Bean may have embezzled company funds. Cleek and Bean thereafter undertook efforts to conceal their fraud and theft by removing and destroying company records, by utilizing a program called DriveScrubber to delete financial data from four (4) company computers and by removing and retaining at least four (4) laptop computers belonging to UTI. Forensic accountants recovered some deleted data including a March 2009 spreadsheet listing approximately 70 bank accounts at approximately 13 financial institutions holding approximately $ 16 million in UTI funds. Virtually all UTI company records and financials since 2009 are now missing or destroyed resulting in Plaintiffs having to hire an in-house CPA and a team of forensic accountants to reconstruct financials and recover deleted data in an effort to file Corporate Income tax returns and to determine nature and extent of the embezzlement and/or theft.

(5) Cleek and Bean forged company checks and issued unauthorized company payments to individuals including, Defendant Matlock, who witnessed two (2) of the forged POAs used to embezzle funds. Cleek and Bean issued unauthorized and/or unearned payments to Bean's children (Nicolas Bean and Kirsten Bean) and to Cleek's sister (Gaye Lawdermilk). Cleek and Bean utilized at least two (2) companies to embezzle, funnel or launder UTI funds as part of their scheme: (1) ARAIZA, an unlicensed insurance company allegedly providing dental and vision benefits to UTI's employees; and (2) Universal Services & Supply, owned by Cleek's sister, Lawdermilk. UTI funds were deposited into an ARAIZA Merrill Lynch bank account and distributed from that account to Kirsten Bean, Lawdermilk and Universal Services & Supply.

3

(6) The precise amount of the theft/embezzlement remains unknown at this time due to the extent of the company records Cleek and Bean removed or destroyed prior to sending their resignation notices by Federal Express on July 7, 2014. The removal and destruction of company records is so extensive that UTI cannot, at this time, accurately calculate company income and expenses to file Corporate Income Taxes.

(7) Cleek and Bean used forged POAs at multiple banks throughout middle Tennessee to embezzle funds including, but not limited to, opening ten (10) unauthorized bank accounts at Putnam 1st Mercantile Bank in Cookeville, Tennessee, utilized to hold, divert and/or embezzle at least $ 2.15 million in UTI funds as of March 31, 2009. See (Exhibits 1 & 2) (Forged POAs and expert analysis of POAs by Eakes and Will). Several million in additional embezzled funds were concealed under various accounting categories including cost of goods sold and were reclassified as employee loans extended by both UTI and Mr. Rogers which have never been repaid. Cleek and Bean committed additional acts of theft and embezzlement through use of company credits cards, fraudulent payments for thousands of hours of unearned vacation and unearned overtime pay, payment for thousands of hours not worked and through use of companies set up to purportedly provide dental and vision coverage for UTI employees.

## PARTIES

(8) Universal Technologies, Inc. is a Tennessee corporation with a principal place of business located at 165 Alsonia Street, Estill Springs, Tennessee 37330.

4

(9) Jesse E. Rogers is a resident of Estill Springs, Tennessee 37330.

(10) Faye Cleek is a Tennessee resident and can be served with process at 4025 Eastbrook Road, Estill Springs, Tennessee 37330.

(11) Carla Bean is a Tennessee resident and can be served with process at 467 Little Hurricane Road, Winchester, Tennessee 37398.

(12) Nicholas Bean is a Tennessee resident and can be served with process at 467 Little Hurricane Road, Winchester, Tennessee 37398.

(13) Gaye Lawdermilk is a Texas resident and can be served with process at 507 West Flemming Avenue, Mertzon, Texas 76941.

(14) Cynthia Matlock is a Tennessee resident and can be served with process at 2590 Rock Creek Road, Estill Springs, Tennessee 37330.

(15) Universal Services & Supply is an unregistered company with a principal place of business at 507 West Flemming Avenue, Mertzon, Texas 76941. Melvin Lawdermilk is the agent for service of process and process can be served at 507 West Flemming Avenue, Mertzon, Texas 76941.

(16)    ARAIZA Company LLC, formerly ARAIZA, is a Tennessee limited liability company with a principal place of business at 313 Country Manor Lane, Winchester, Tennessee 37398. Carla Bean is the registered agent for service of process and process can be served at 313 Country Manor Lane, Winchester, Tennessee 37398.

## JURISDICTION AND VENUE

(17)  Jurisdiction is predicated upon original jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.  Jurisdiction is conferred under 28 U.S.C. § 1331 by virtue of 18 U.S.C. §§ 1030 & 1964 and 29 U.S.C. §§ 1104, 1106, 1109 & 1132.

(18)  Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the alleged events giving rise to the original claims occurred and/or continue to occur in this district, the Middle District of Tennessee.

(19)  Cleek and/or Bean, utilized a forged and fraudulently notarized POA to surreptitiously open at least ten (10) unauthorized banks accounts in this district for purposes of holding, diverting and embezzling Plaintiffs' funds in violations of 18 U.S.C. § 1344.  Cleek and/or Bean utilized the ten (10) bank accounts at Putnam 1st Mercantile Bank to hold and/or embezzle approximately $ 2.15 million and three (3) accounts opened in Cleek's name with at least $ 735,000 of Plaintiffs' funds remain open.

## FACTUAL BACKGROUND

6

(20) Jesse E. Rogers, a machinist, formed Universal Machining Company, Inc., and began operations in 1972.

(21) Universal Machining Company, Inc., began as a small company owned and operated by Mr. Rogers and two (2) other machinists.

(22) Business was slow during the initial year of operation and Mr. Rogers, at the request of his partners, bought out his partners in 1973 and became the sole owner of Universal Machining Company, Inc.

**Cleek's Employment**

(23) Universal Machining Company, Inc.'s, business began to slowly increase and Mr. Rogers hired Cleek as a bookkeeper to handle the company's books and financials in 1974.

(24) Upon hiring Cleek in 1974 to handle the company's books and financials, Mr. Rogers focused his time and efforts in the shop performing the duties of his trade as machinist in an effort to provide high quality products and grow his company.

(25) Mr. Rogers negotiated and procured contracts with General Motors, NASA and branches of the armed forces during the 1980s.

7

(26) Mr. Rogers' procurement of the NASA and military contracts resulted in rapid growth of Universal Machining Company, Inc., throughout the 1980s.

(27) During the 1980s, Mr. Rogers was recognized in the defense industry for his ability to design, create and manufacturer high-tech, complex component parts that presented unique challenges and specifications that other, often much larger and more established, defense contractors were often unable to design or produce.

(28) On August 25, 1987, Mr. Rogers changed the name of his company from Universal Machining Company, Inc., to Universal Technologies, Inc. ("UTI").

(29) Mr. Rogers was the sole shareholder and sole owner of UTI on August 25, 1987.

(30) Cleek continued to work for Mr. Rogers as UTI's bookkeeper after the name change on August 25, 1987.

(31) Cleek served as the corporate Secretary and/or Secretary-Treasurer for UTI after 1987.

(32) Mr. Rogers placed his trust, reliance, faith and confidence in Cleek to operate the front office and handle UTI's money, financial matters and financial records while he cultivated new business and supervised the shop.

8

## Bean's Employment

(33) Cleek brought her minor daughter, Carla Bean, to Universal Machining Company, Inc., during the early 1980s to assist Cleek with various office tasks.

(34) Bean ultimately became an employee of Universal Machining Company, Inc., in the 1980s.

(35) As an employee of Universal Machining Company, Inc. (and later UTI), Bean worked in the front office assisting her mother, Cleek.

(36) Bean eventually assumed duties and responsibilities related to the company's financials, book keeping and payroll.

(37) Throughout the 1980s, the 1990s and through July 2014, Mr. Rogers placed his trust, faith, reliance and confidence in both Cleek and Bean to handle the company's money and financial records so that he could focus his time on product design, product development, quality assurance, obtaining contracts and supervising a staff of approximately 100 employees and/or machinists working in multiple shops.

(38) Mr. Rogers procured large government contracts from the 1980s to present to design, develop, and manufacture complex components and/or items for the military including, but not limited to, component parts for the Hawk Missile, the Sparrow Missile, the Tomahawk Missile,

9

the Blackhawk helicopter, the C130, and gun or missile mounts for vehicles, helicopters and naval vessels.

## **Employee Theft/Embezzlement and Destruction of Company Records to Conceal Theft**

(39)  UTI began experiencing periods of large profitability during the late 1980s.

(40)  Upon information and belief, Cleek and Bean began abusing and/or exploiting their positions of trust during the late 1980s by stealing large sums of money from UTI and its owner, Mr. Rogers.

(41)  An IRS audit and discovery of ten (10) unauthorized and fraudulently opened bank accounts at Putnam 1st Mercantile Bank in Cookeville, Tennessee, in the fall of 2013 resulted in Mr. Roger's suspicions that Cleek and Bean may have embezzled company funds.

(42)  Mr. Rogers is seventy-two (72) years-old, in poor health and was devastated by the suspicion or concern that Cleek and Bean, whom he trusted and considered to be like family since the 1970s, may have stolen or embezzled money from him and his company.

(43)  Mr. Rogers was initially very reluctant to accept the proposition that Cleek and Bean, whom he considered family, embezzled money from him or his company.

(44)  Mr. Rogers advised Cleek and Bean in January of 2014 that only he was authorized to sign company checks and company payroll.

(45)  Checks for Cleek and Bean's authorized payroll amounts were signed by Mr. Rogers in 2014.

(46)  Cleek and/or Bean surreptitiously, and without authorization, continued to issue and sign UTI company checks for irregular and unauthorized amounts made payable to themselves and to Bean's children between January 2014 and July 2014 including, but not limited to, unauthorized checks totaling approximately $ 725,000 during June of 2014.

(47)  In 2014, Mr. Rogers hired a new book-keeper for oversight and/or to assist Cleek and Bean in handling the company's bookkeeping and financials.

(48)  Cleek became irate and attempted to have the new book-keeper removed or terminated.

(49)  Mr. Rogers refused to terminate the new book-keeper and Cleek and Bean thereafter began removing company files, destroying company records and deleting company computer files with a program called DriveScrubber.

(50)  Mr. Rogers contacted the local police on two (2) occasions in an effort to stop Cleek and Bean from removing company files, but the police advised that the issue was a civil matter.

11

(51) Cleek and Bean removed and/or destroyed company tax records and documentation needed to file taxes or support prior tax year filings including, but not limited to, company copies of employee W2s and all documents, data, and receipts needed to calculate or supporting line item entries for tax year 2013 and prior years.

(52) After removing and destroying company financial records, removing and/or retaining company computers and deleting computer files to conceal their theft/embezzlement, Cleek and Bean sent resignation notices to UTI via Federal Express on July 7, 2014.

### Use of DriveScrubber on Computers and Theft of Company Computers

(53) Mr. Rogers hired an in-house CPA and a forensic accounting firm, Crosslin & Associates, to reconstruct and/or recover data, files and information in an effort to determine the extent of Cleek and Bean's theft.

(54) Cleek and Bean essentially removed and/or destroyed company financials, payroll records, check stubs, bank statements, ledgers, receipts, accounts payable records, accounts receivable records, inventory records, records and invoices related to ARAIZA and records and invoices related to Universal Services and Supply.

(55) The forensic accountants examined company computers that remained on premises and discovered that Cleek and/or Bean utilized a program called DriveScrubber to delete and/or

destroy company data, payroll, book keeping, insurance, and financial records on the following computers:

    (1)  Computer labeled "Carla I" containing two (2) hard drives;

    (2)  Computer labeled "Carla II" containing one (1) hard drive;

    (3)  Computer labeled "Payroll" containing two (2) hard drives; and

    (4)  Computer labeled "Insurance" containing two (2) hard drives.

(56)  Forensic accountants and Information Technology specialists in data recovery are attempting to recover data from the computer labeled "Insurance" as that computer was apparently utilized to operate UTI's Peachtree accounting software program in addition to insurance related files.

(57)  Cleek and/or Bean removed and retained at least four (4) laptop computers belonging to UTI that were utilized for payroll, accounting and book-keeping purposes including, but not limited to the following computers:

    (1)  Dell Studio 15 Notebook (Studio 1555) purchased on 12-15-09;

    (2)  Dell Studio XPS 1640 Notebook purchased on 12-15-09;

    (3)  Sony Laptop purchased on 12-20-06; and

    (4)  Sony Laptop purchased on 12-20-06.

(58) UTI paid $ 5,700 for the two (2) Sony Laptop computers and $ 6,512.77 for the two (2) Dell Laptops that Cleek and/or Bean have removed and retained in an effort to conceal the nature and extent of their theft. Upon information and belief, Cleek and Bean removed and retained other laptops purchased by or belonging to UTI.

(59) Cleek and Bean removed and retained documents and computers that contained confidential and proprietary information relating to UTI customers including confidential customer information, vendors, cost structures, customer pricing, design specifications related to proprietary products and information related to proprietary processes, materials and compounds.

(60) Cleek and Bean's removal and destruction of company records, financials, computers and deletion of computer data has resulted in UTI's inability to calculate and file taxes.

## Forensic Accountants Findings and Theft

(61) Plaintiffs were forced to incur considerable expense associated with hiring an in-house CPA and a forensic accounting firm to reconstruct and/or recover data in an effort to determine the financial status of UTI, determine the extent of Cleek and Bean's theft and to reconstruct records sufficiently to file taxes.

(62) Cleek and Bean attempted to conceal the embezzled funds from the Plaintiffs and the IRS in various accounting/bookkeeping categories including, but not limited to, cost of goods sold and/or reclassified the embezzlement as unpaid employee loans from UTI and Mr. Rogers.

(63) Several million dollars in funds embezzled by Cleek and Bean were held in unauthorized bank accounts opened with fraudulent POAs throughout middle Tennessee. These funds apparently (records have been destroyed) remained on UTI's books for tax purposes while Cleek and Bean exercised control over, utilized and diverted the funds.

(64) During their last 30 days at UTI and immediately prior to sending their resignation letters by Federal Express on Monday, July 7, 2014, Cleek and/or Bean issued and signed the following checks totaling in excess of $ 724,000.00 without authorization:

(1) $ 322,285.55 issued to Faye T. Cleek on June 27, 2014;

(2) $ 136,227.23 issued to Carla C. Bean on June 27, 2014;

(3) $ 70,979.41 issued to Faye T. Cleek on June 27, 2014;

(4) $ 70,044.45 issued to Faye T. Cleek on June 27, 2014;

(5) $ 9,179.45 issued to Nicolas A. Bean on June 27, 2014;

(6) $ 17,725.88 issued to Carla C. Bean on June 16, 2014;

(7) $ 3,337.77 issued to Nicolas A. Bean on June 9, 2014;

(8) $ 48,482.86 issued to Faye T. Cleek on June 2, 2014; and

(9) $ 45,792.92 issued to Faye T. Cleek on June 2, 2014.

All nine (9) checks listed above were signed by Cleek who was not authorized to sign checks in June of 2014.

(65) On or about June 19, 2014, Cleek withdrew $ 320,081.56 belonging to Plaintiffs from Regions Bank, Account # 720244XXXX and closed the account. Cleek had previously withdrawn, by cashier's check, $ 300,000 belonging to Plaintiffs from this same account on August 28, 2013.

(66) On or about September 19, 2013, Cleek withdrew, by cashier's check, $ 235,000 belonging to Plaintiffs from Regions Bank, Account # 8251XXXX.

(67) On or about July 15, 2008, Cleek opened two (2) personal accounts and Bean opened one (1) account at SunTrust. The accounts were opened with three (3) unauthorized $ 100,000 UTI company checks signed by Cleek and dated July 15, 2008. These accounts currently hold approximately $ 750,000 in funds belonging to UTI and/or Mr. Rogers.

(68) Upon recovering deleted computer data, the forensic accountants discovered spreadsheets prepared by Cleek and/or Bean containing bank account information and balances of multiple bank accounts, most of which were opened by Cleek and/or Bean with one or more forged and fraudulently notarized POAs.

(69) A spreadsheet recovered from one of Bean's deleted hard drives provided bank account balances for approximately 70 accounts at 13 financial institutions. The balances

reflected on the spreadsheet range from September 2007 through March 2009. Records since March 2009 are virtually nonexistent, missing and/or destroyed. The data recovered from Bean's hard drive, however, reflects as follows:

(a) Two (2) accounts at American City Bank holding $ 329,599.13;

(b) Ten (10) accounts at Citizens Community Bank holding $ 1,007,581.39;

(c) Three (3) accounts at Franklin County United Bank holding $ 76,763.91;

(d) One (1) account at First National Bank holding $345,058.08;

(e) Six (6) accounts at First Vision Bank holding $ 814,177.70;

(f) Ten (10) accounts at Putnam 1st Mercantile Bank holding $ 2,158,073.82;

(g) Three (3) accounts at People Bank of Bedford County holding $ 301,872.06;

(h) Five (5) accounts at Regions holding $ 1,329,530.70;

(i) Eighteen (18) accounts at SunTrust Bank holding $ 7,452,459.18;

(j) Three (3) accounts at The Bank of Tullahoma holding $ 79,365.39;

(k) Seven (7) accounts at Traders National Bank holding $ 703,797.02;

(l) One (1) account at US Bank holding $ 602,817.11

(70) Cleek and/or Bean removed, retained and/or destroyed check ledgers and checking account information prior to sending their resignation by Federal Express on July 7, 2014.

(71) Since early July 2014, Mr. Rogers and the forensic accountants have recovered some data and began reconstructing ledgers based on information obtained from the multiple banks

17

utilized by Cleek and Bean.  Records, however, are partial and subject to the record retention policies of each individual bank.

(72)  While only a partial nonexclusive list of Cleek and/or Bean's theft and activities, the following provides a sampling of the irregular and/or unapproved company checks issued and signed by Cleek and Bean:

(a)  $ 25,000 payable to Faye Cleek on 2-18-09, Mr. Rogers' signature forged by Cleek;

(b)  $ 19,000 payable to SunTrust on 3-9-09, Mr. Rogers' signature forged by Bean;

(c)  Twelve (12) checks for $ 1,200,000 dated July 15, 2008, ten (10) of which were payable to accounts with Cleek or Bean's name on the accounts;

(d)  $ 250,000 (ck # 73056) payable to Regions Bank on 10-16-08, check signed by Cleek;

(e)  $ 250,000 (ck # 73057) payable to Regions Bank on 10-16-08, check signed by Cleek;

(f)  $ 500,000 payable to First Vision Bank on 2-18-09, check signed by Cleek;

(g)  $ 25,000 payable to Faye Cleek on 2-18-09, Mr. Rogers' signature forged by Cleek;

(h)  $ 500,000 payable to Citizens Community Bank on 2-18-09, check signed by Cleek;

(i)  $ 100,000 payable to Citizens Community Bank on 3-17-09, check signed by Cleek;

(j)  $ 200,000 payable to First Vision Bank on 3-24-09, check signed by Cleek; and

(k)  $ 200,000 payable to Regions Bank on 3-25-09, check signed by Cleek.

## Payroll/Vacation Pay Theft and Fraud

(73) Bean was responsible for UTI's payroll and Cleek signed the payroll checks prior to January 2014.

(74) Prior to resigning on July 7, 2014, Cleek and/or Bean removed and/or destroyed UTI payroll records, payroll stubs and UTI's copy of its employees' W2s.

(75) The forensic accountants located approximately four (4) months of Bean's pay stubs ranging from January 18, 2013, through May 10, 2013, that had not been removed or destroyed.

(76) In addition to Bean's pay stubs covering January 18, 2013, through May 10, 2013, the forensic accountants further obtained a copy of the both Cleek and Bean's final UTI pay stubs dated June 29, 2014.

(77) Plaintiffs requested and received records from the Tennessee Unemployment agency to determine what UTI had paid all of its employees since 2007. Bean reported UTI employee income to the Tennessee Unemployment agency.

(78) Bean was compensated at $ 29.00 per hour, but she reported, for purposes of Tennessee Unemployment, that she received the following yearly wages from UTI: (1) $ 137,204.69 for 2007; (2) $ 153,962.08 for 2008; (3) $ 252,673.07 for 2009; (4) $ 237,295.72 for 2010; (5) $ 273,509.00 for 2011; (6) $ 261,609.40 for 2012; (7) $ 366,357.95 for 2013.

(79)  Bean testified under oath on August 27, 2013, as a witness in a civil lawsuit involving UTI that she made less than $ 100,000 per year at UTI.

## Vacation Pay Theft - Bean

(80)  Bean's pay stubs from January 18, 2013, through May 10, 2013, reflect the following irregularities and/or theft through manipulation of UTI's vacation policy that only permitted Bean to earn four (4) hours of vacation pay per week:

(1)  Bean's pay stub dated 1-25-13 denotes that she had 2,255 hours of unused vacation.  (Exhibit 3);

(2)  Bean paid herself $ 29,435 on 2-1-13 representing use of 1,015 hours of vacation and leaving a purported 1,240 hours of unused vacation.  (Exhibit 4);

(3)  On 2-8-13, Bean paid herself another $ 2,320 on 2-8-13 representing 80 hours of vacation and leaving a purported 1,164 hours of unused vacation.  (Exhibit 5);

(4)  A week later, on 2-15-13, Bean's unused vacation increased from 1,164 hours to 3,668 hours for an increase of 2,504 vacation hours during a single week.  (Exhibit 6);

(5)  Bean paid herself $ 696 in vacation pay on 2-22-13 leaving a purported 3,648 hours of unused vacation on 2-22-13.  (Exhibit 7);

(6)  Bean paid herself $ 28,971 in vacation pay on 3-1-13 representing 999 hours of vacation pay and leaving a purported 2,653 hours of unused vacation.  (Exhibit 8);

(7)  Bean paid herself $ 28,971 in vacation pay on 4-5-13 representing 999 hours of vacation pay and leaving her a purported 1,678 hours of unused vacation.  (Exhibit 9);

(8)  Bean paid herself $ 26,100 in vacation pay on 4-26-13 representing 900 hours of vacation pay.  (Exhibit 10);

20

(4)  On 4-26-13, Bean's unused vacation increased to 3,794 hours of unused vacation reflecting that Bean's accrued 3,008 hours of unused vacation in a single week.  (Exhibit 10).

(81)  Bean paid herself $ 118,581 in vacation pay between January 25, 2013 and May 3, 2013, and purportedly accrued over 5,550 hours of additional vacation hours during that same 24 week timeframe.


## Overtime Theft - Bean


(82)  Bean's recovered pay stubs (spanning January 18, 2013, through May 10, 2013) reflect fraud and/or theft in the payment of "overtime" as follows:


(1)  Bean paid herself 32.50 hours of overtime on May 10, 2013.  (Exhibit 11);

(2)  Bean paid herself 62.50 hours of overtime on April 19, 2013.  (Exhibit 12);

(3)  Bean paid herself 62.50 hours of overtime on April 12, 2013.  (Exhibit 13);

(4)  Bean paid herself 82.00 hours of overtime on April 5, 2013.  (Exhibit 9);

(5)  Bean paid herself 56.00 hours of overtime on March 28, 2013.  (Exhibit 14);

(6)  Bean paid herself 48.50 hours of overtime on March 22, 2013.  (Exhibit 15);

(7)  Bean paid herself 58.75 hours of overtime on March 15, 2013.  (Exhibit 16);

(8)  Bean paid herself 42.00 hours of overtime on March 8, 2013.  (Exhibit 17);

(9)  Bean paid herself 36.50 hours of overtime on February 15, 2013.  (Exhibit 6); and

(10)  Bean paid herself 29.75 hours of overtime on January 25, 2013.  (Exhibit 3).

(83)  Cleek and/or Bean removed or destroyed other employee pay stubs, pay roll records and payroll tax records between May 10, 2013, and June 2014.

### Bean's June 29, 2014 Pay Stub

(84)  Bean was compensated by UTI at an hourly rate of $ 29.00, but her final paystub dated June 29, 2014 reflects that she received $ 188,122.13 between January 1, 2014, and June 29, 2014, itemized as follows:

(1)  Bean received $ 56,382.96 in regular pay reflecting that she worked 1,944 hours at her hourly rate of $ 29 dollars per hour during her last six (6) months at UTI.  (Exhibit 18);

(2)  Bean received $ 45,946.52 in vacation pay representing approximately 1,056 hours of overtime.  (Exhibit 18);

(3)  Bean received $ 30,855.52 in vacation pay constituting 1,064 hours of vacation time.  (Exhibit 18);

(4)  Bean received $ 14,384 for 496 hours classified as "Sick Leave or Pay Due to Injury."  (Exhibit # 14).

(5)  Bean received $ 1,624 for 21.5 hours in holiday pay.  (Exhibit 18);

(6)  Bean received $ 29,999.70 for working in the "Molding and Heat Treating" representing approximately 1,000 hours of work in the "Molding and Heat Treating."  Bean never worked in the "Molding and Heat Treating" shop. (Exhibit 18).

(5)  Bean received $ 9,929.24 for working in "Sand Blasting and Forging" representing approximately 320 hours of work in "Sand Blasting and Forging." Bean never worked in the "Sand Blasting and Forging" shop.  (Exhibit 18).

22

Accordingly, Bean's June 29, 2014, pay stub reflects that she worked or received pay for approximately 5,901 hours during her last six (6) months at UTI.

## Cleek's June 29, 2014 Pay Stub

(85) Cleek was a salaried employed compensated by UTI at a weekly rate of $ 3,606 equating to approximately $ 90 per hour.

(86) Cleek's final pay stub was dated June 29, 2014, and her compensation calculated at $ 3,606 per week should have been $ 93,756 as of June 29, 2014.

(87) Cleek's June 29, 2014, paystub reflects that Cleek paid herself $ 710,021.41 representing approximately 3,718 hours of work and 4,000 hours of vacation and holiday pay during a six (6) month period of time and itemized as follows:

(1) Cleek received $ 108,180 for payment of salary representing 30 weeks at $ 3,606 per week. (Exhibit 19);

(2) Cleek paid herself $ 90,149.10 in unauthorized payments under the category of "Regular" pay representing approximately 1,000 hours of pay at $ 90 per hour. (Exhibit 19);

(3) Cleek paid herself $ 270,268.80 in vacation pay representing approximately 3,000 hours of vacation time at $ 90 per hour. (Exhibit 19);

(4) Cleek paid herself $ 90,149,10 in holiday pay representing approximately 1,000 hours of holiday pay at $ 90 per hour. (Exhibit 19);

(5) Cleek paid herself $ 90,149.10 based on 1,000 hours of work performed in "Molding and Heat Treating." Cleek never worked in the "Molding and Heat Treating" shop. (Exhibit 19).

23

(6)  Cleek paid herself $ 61,125.31 for 678 hours of work performed in "Sand Blasting and Forging."  Cleek never worked in the "Sand Blasting and Forging" shop. (Exhibit 19).

(88)  Cleek signed her own large, unauthorized checks between January 1, 2014, and June 29, 2014, even though she had no authority to sign checks in 2014.

(89)  Cleek received an annual salary of $ 187,500 from UTI, but Bean reported her yearly wages, for purposes of Tennessee Unemployment, as follows:  (1) $ 206,262.00 for 2007; (2) $ 242,602.00 for 2008; (3) $ 249,912.00 for 2009; (4) $ 191,118.00 for 2010; (5) $ 224,436.00 for 2011; (6) $ 219,966.00 for 2012; and (7) $ 227,148 for 2013.

(90)  UTI's forensic accounting team is currently attempting to recover and reconstruct further data and financials in an effort to determine the full extent of Cleek and Bean's payroll and vacation pay theft.  The full extent of their theft is unknown due to their removal and/or destruction of company data and documents in an effort to conceal their fraud and theft.

### Nicolas Bean's Unauthorized Compensation

(91)  Cleek and/or Bean removed and/or destroyed payroll records and payroll stubs related to payments Cleek and/or Bean made to Bean's son, Nicolas Bean.

(92)  Plaintiffs are unaware as to how, why or at what rate Nicolas Bean was compensated.

24

(93)  While employer copies of W2s and payroll records are missing and/or destroyed, records were recently obtained from the Tennessee Unemployment Compensation office in an effort to determine what Cleek and/or Bean had reported as compensation for themselves and Nicolas Bean.

(94)  Cleek and/or Bean made $ 58,202.56 in unauthorized payments to Nicolas Bean during the fourth (4th) quarter of 2012.

(95)  Cleek and/or Bean made $ 85,095.00 in unauthorized payments to Nicolas Bean during 2013.

(96)  Cleek and/or Bean made an unauthorized payment to Nicolas Bean of $ 9,179.45 on June 27, 2014.

(97)  Cleek and/or Bean made an unauthorized payment to Nicolas Bean of $ 3,337.77 on June 9, 2014.

### Forged Minute Book Entries by Cleek

(98)  Mr. Rogers was the sole shareholder and sole owner of Universal Technologies, Inc., on August 25, 1987, the date of incorporation under the new name.

(99)  Mr. Rogers has remained the sole shareholder and sole owner of Universal Technologies, Inc., since August 25, 1987.

(100)  Cleek forged Mr. Rogers' name on a corporate minute entry dated/backdated November 2, 1998, purporting to give herself twenty-five (25 %) percent ownership of UTI.  See (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes); (Exhibit 2) (Forged Minute Book entry and expert analysis of entries by Emily Will).

(101)  After resigning from UTI on July 7, 2014, Cleek contacted an attorney and made a demand upon UTI, through her attorney, for 25 % of UTI based on the UTI corporate minute book entries forged by Cleek.

(102)  From 1998 to present, Cleek held herself out as Secretary-Treasurer of UTI to third-parties including, but not limited to, banks and governmental agencies.

(103)  From 1998 to present, Cleek represented to third-parties including, but not limited to banks and government agencies, that Mr. Rogers was the sole owner of UTI.

(104)  From 1998 to present, Cleek signed banking documents as "Sec/Treas" of UTI.

(105)  UTI's U.S. Corporation Income Tax Returns, prepared in part by and/or with assistance of Cleek and Bean, list Mr. Rogers as owning 100 % of UTI's stock.

26

(106) Cleek is not listed as an owner or stockholder on UTI's corporate tax returns.

## POAs forged by Cleek and Notarized by Bean to Commit Bank Fraud

(107) Cleek and/or Bean utilized forged and fraudulently notarized POAs to open unauthorized bank accounts at multiple banks throughout middle Tennessee.

(108) Mr. Rogers' signatures on the POAs were forged and fraudulently notarized by Bean. See (Exhibit 1) (Forged POAs and expert analysis of POAs by Jane Eakes); (Exhibit 2) (Forged POAs and expert analysis of POAs by Emily Will).

(109) Defendant, Cynthia Matlock, signed two (2) of the forged and fraudulently notarized POAs as a witness.

(110) Cleek and/or Bean issued Matlock two (2) checks totaling $ 34,635.22 drawn from the UTI company account. Both checks were dated and issued on the same day.

(111) Mr. Rogers did not authorize the two (2) checks issued to Matlock totaling $ 34,635.22. Mr. Rogers' name was forged on both checks by Bean. See (Exhibit 1) (Forged checks issued to Matlock and expert analysis of checks by Jane Eakes);

(112) The forged and fraudulently notarized POAs were utilized by Cleek and Bean as part of a scheme devised to embezzle and/or launder large sums of money stolen from Plaintiffs

27

through multiple unauthorized bank accounts and two (2) companies, ARAIZA and Universal Services and Supply.

## Bank Fraud at Putnam 1st Mercantile Bank in Cookeville, Tennessee,

(113) On or about October 2, 2008, Cleek and/or Bean opened approximately ten (10) bank accounts at Putnam 1st Mercantile Bank in Cookeville, Tennessee.

(114) Cleek and/or Bean were not authorized to open the ten (10) bank accounts with UTI funds at Putnam 1st Mercantile Bank on October 2, 2008, and Mr. Rogers was unaware that Cleek and/or Bean were opening these accounts.

(115) Cleek and/or Bean presented Putnam 1st Mercantile Bank a Power of Attorney for Mr. Rogers dated September 24, 2008, to open the accounts at Putnam 1st Mercantile Bank on or about October 2, 2010.

(116) Mr. Rogers did not sign the September 24, 2008, Power of Attorney that Cleek and/or Bean presented to Putnam 1st Mercantile Bank on or about October 2, 2008. See (Exhibit 1) (Forged POAs and expert analysis of POAs by Jane Eakes); (Exhibit 2) (Forged POAs and expert analysis of POAs by Emily Will).

(117) Mr. Rogers' name was forged and fraudulently notarized by Bean on the September 24, 2008, Power of Attorney utilized to open multiple unauthorized accounts at Putnam 1st

Mercantile Bank on or about October 2, 2008. See (Exhibit 1) (Forged POAs and expert analysis of POAs by Jane Eakes); (Exhibit 2) (Forged POAs and expert analysis of POAs by Emily Will).

(118) On or about October 2 or October 3, 2014, Cleek and/or Bean deposited $ 95,000 into each of the ten (10) accounts at Putnam 1st Mercantile Bank.

(119) Cleek signed each one of the $ 95,000 checks that were deposited into the ten (10) accounts at Putnam 1st Mercantile Bank in October of 2008.

(120) All ten (10) of the $ 95,000 checks Cleek and/or Bean deposited at Putnam 1st Mercantile Bank in October of 2008 consisted of UTI funds drawn from UTI's company operating account.

(121) Mr. Rogers neither had knowledge of nor consented to Cleek and/or Bean depositing the ten (10) checks for $ 95,000 into Putnam 1st Mercantile Bank in October of 2008.

(122) In March of 2009, Cleek and/or Bean deposited $ 150,000 into eight (8) of the ten (10) Putnam 1st Mercantile Bank accounts for an aggregate deposit of $ 1,200,000.

(123) Cleek and/or Bean utilized the United States Postal Service to mail the eight (8) $ 150,000 checks to Putnam 1st Mercantile Bank on or about March 7, 2009.

(124)  Cleek signed all eight (8) of the $ 150,000 checks deposited at Putnam 1st Mercantile Bank on or about March of 2009 and all eight (8) checks were drawn from UTI's account.

(125)  Mr. Rogers neither had knowledge of nor consented to Cleek and/or Bean issuing or depositing the eight (8) checks for $ 150,000 into Putnam 1st Mercantile Bank in March of 2009.

(126)  Mr. Rogers had no knowledge of the ten (10) accounts at Putnam 1st Mercantile Bank until the fall of 2013 when Cleek and/or Bean were forced to disclose the existence of those accounts during unrelated litigation and/or during an IRS audit of UTI.

(127)  Cleek and/or Bean removed, retained and/or destroyed all documents and computer records relating to the Putnam 1st Mercantile Bank accounts prior to sending their resignation notices by Federal Express in July 2014.

(128)  Forensic accountants recovered a spreadsheet deleted from one of Bean's computer hard drives reflecting that as of March 31, 2009, eight (8) of the Putnam 1st Mercantile Bank accounts had individual balances of $ 245,763.01 and two (2) of the accounts had individual balances of $ 95,754.37.

(129)  Cleek and/or Bean closed one (1) of the Putnam 1st Mercantile Bank accounts on March 25, 2013.  This account had a balance of $ 258,707.34 when the account was closed all of which was retained and/or converted by Cleek and/or Bean upon closing the account.

(130)  Cleek and/or Bean closed one (1) of the Putnam 1st Mercantile Bank accounts on September 23, 2013.  The account had a balance of $ 260,679.93 when the account was closed all of which was retained and/or converted by Cleek and/or Bean upon closing the account.

(131)  Three of the accounts at Putnam 1st Mercantile Bank remain in Cleek's name.  The current balances of those accounts are unknown.  Cleek, however, deposited at least $ 245,000 into each of the three (3) accounts prior to March 31, 2009.  The $ 735,000 deposited into these accounts between October 2, 2008, and March 31, 2009, were UTI funds converted/embezzled by Cleek.

(132)  The five (5) remaining Putnam 1st Mercantile Bank accounts had been substantially drained by Cleek and/or Bean when Mr. Rogers closed those accounts.  For instance, one account that had a balance of $ 245,996.14 on March 31, 2009, had a balance of only $ 18,746.37 on the date Mr. Rogers closed the account.  Cleek and/or Bean converted/embezzled the funds missing from these five (5) accounts.

(133)  Upon information and belief, more forged and fraudulently notarized POAs exist and/or have been used by Cleek and/or Bean at other undiscovered financial institutions and/or

31

have been used by Cleek and/or Bean for purposes of financial gain through means of deception or fraud. Cleek and/or Bean removed, retained and/or destroyed those records.

## ARAIZA and Universal Services & Supply Co.

(134) Cleek and Bean removed, retained and/or destroyed most documents related to ARAIZA and Universal Services & Supply, including payments to, payments from or transactions with those companies. Forensic accountants and Information Technology specialists in data recovery, however, recovered some records Cleek and Bean inadvertently left behind reflecting that Cleek, Bean and Cleek's sister (Gaye Lawdermilk), utilized ARAIZA and Universal Services & Supply to embezzle, steal and/or launder money stolen from UTI under the guise of being an insurance company providing dental and vision coverage for UTI's employees since approximately 1994.

(135) ARAIZA is owned, operated and/or managed (partly or in whole) by Cleek.

(136) Universal Services & Supply is owned, operated and/or managed (partly or in whole) by Lawdermilk.

(137) Neither ARAIZA nor Universal Services & Supply are licensed as insurance companies and ARAIZA was an unregistered and/or an unlicensed business while Cleek and Bean were employed at UTI.

32

(138)  Cleek and/or Bean used ARAIZA to funnel UTI funds to:  (1)  Bean's daughter (Kirsten Bean); (2)  Cleek's sister (Gaye Lawdermilk); and (3)  Universal Services & Supply, a company owned and operated by Gaye Lawdermilk and/or her husband, Melvin Lawdermilk.

(139)  Cleek would make monthly payments to ARAIZA for the dental and vision "premiums."  The premium payments were comprised of:  (1)  monthly employee ("EE") contribution for dental; (2)  monthly EE contribution for vision; and (3)  Cleek would have UTI pay an additional amount to ARAIZA each month that represented ten (10 % ) percent of the aggregate total of the monthly EE deductions for both vision and dental.  All three (3) amounts were comingled in a single ARAIZA account maintained with Merrill Lynch.

(140)  Cleek would periodically funnel UTI funds through ARAIZA that were wholly unrelated to the monthly premium payments based on EE contributions + the 10% additional payment by UTI.

(141)  On March 17, 2008, Cleek deposited check # 71074 for $ 50,000 into the ARAIZA account.  The $ 50,000 check was drawn from a UTI account and a copy of the check was found by the forensic accountants under a desk after Cleek and Bean had vacated the building.

(142)  The next sequenced check, # 71075, drawn from the same UTI account was issued to Cleek for $ 25,000 on March 17, 2008, signed by Cleek and noted as "emp loan" in the memo box.

(143) The sole ARAIZA account statement found to date is from 2009 and reflects the following pattern for payments for claims and payments to Kirsten Bean, Gaye Lawdermilk and Universal Services & Supply:

    (1) In February 2009, ARAIZA disbursements were as follows:

        (a) $ 4,240 in payments to various dental and vision providers;

        (b) $ 6,600 to Universal Services & Supply; and

        (c) $ 620 to Kirsten Bean.

    (2) Between December 1 and 16, ARAIZA disbursements were as follows:

        (a) $ 1,829 in payments to various dental and vision providers;

        (b) $ 4,500 to Universal Services & Supply;

        (c) $ 731 to Kirsten Bean; and

        (d) $ 1,000 to Gaye Lawdermilk.

    (3) In April 2009, ARAIZA disbursements were as follows:

        (a) $ 4,064 in payments to various dental and vision providers;

        (b) $ 4,107 to Universal Services & Supply; and

        (c) $ 400 to Kirsten Bean.

(144) Aside from the payments to dental and vision providers, the ARAIZA disbursements set forth above were not for the benefit of UTI, its employees, or the dental and vision plan, but were for the benefit of Cleek, Bean, Universal Services & Supply, Lawdermilk, and/or Kirsten Bean.

## CAUSES OF ACTION

### CLAIM I

### Declaratory Relief

### (Applicable to Cleek)

(145)  Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (144) of this Complaint as if each were set forth separately herein.

(146)  This claim is applicable to Cleek and seeks Declaratory Judgment as to the ownership of UTI.

(147)  Mr. Rogers is currently and has been the sole owner and sole shareholder of UTI and its predecessor company, Universal Machining Company, Inc., since 1973.

(148)  Mr. Rogers at no time gave, sold or transferred any portion of UTI ownership or UTI stock to Cleek or anyone else.

(149)  Cleek forged Mr. Rogers' signature on a corporate minute document dated/backdated November 2, 1998, purporting to give herself twenty-five (25 %) percent of UTI.  See (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes); (Exhibit 2) (Forged Minute Book entry and expert analysis of entries by Emily Will).

(150) Since 1998, Cleek represented to third parties including, but not limited to, banks and government agencies that Mr. Rogers was the sole owner of UTI.

(151) From 1998 to present, Cleek identified herself as and signed documents as Secretary Treasurer of UTI to third-parties including, but not limited to, banks and governmental agencies, but Cleek did not hold herself out as or sign as "owner" or "shareholder" of UTI.

(152) Mr. Rogers is listed on UTI's "U.S. Corporation Income Tax Return" as owning "100.00%" of UTI's stock.

(153) Cleek is currently asserting that she owns twenty-five percent (25%) of UTI's stock. Plaintiffs deny she owns any portion of UTI. As such, there is an actual controversy between the parties which can be adjudicated by this Court.

(154) Plaintiffs request that this Court declare and/or hold that Cleek forged Mr. Rogers' signature on minute book entries purporting to give Cleek twenty-five (25 %) percent ownership of UTI and declare Mr. Rogers as the true, rightful and sole one-hundred (100 %) percent owner of UTI. See (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes); (Exhibit 2) (Forged Minute Book entry and expert analysis of entries by Emily Will).

(155) Plaintiff is entitled to costs including, but not limited to, expert costs and fees incurred as the result of Cleek's forgery and Cleek's claim of 25 % ownership of UTI based on her own forgery of Mr. Rogers' signature.

36

## CLAIM II

## Civil RICO, 18 U.S.C. § 1962(c)

### (Applicable to All Defendants)

(156)  Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (155) of this Complaint as if each were set forth separately herein.

(157)  All Defendants, their agents and/or employees are a group of persons, formal or informal, associated together for the common purpose of engaging in conduct constituting an association-in-fact.

(158)  The various individuals and companies forming the association-in-fact functioned together as a continuing unit.

(159)  All Defendants are part of an association-in-fact or part of a scheme that has been devised to embezzle/steal money from UTI and its seventy-two (72) year old owner, Mr. Rogers, who is in poor health.

(160)  From on or about 1990 to present, Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18

37

U.S.C. § 1962(c); including multiple acts of bank fraud, 18 U.S.C. § 1344; mail fraud, 18 U.S.C. § 1341; wire fraud 18 U.S.C. § 1343; money laundering, 18 U.S.C. § 1956; and/or financial fraud 18 U.S.C. § 1344.

(161) Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity.

(162) Defendants have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics, specific hierarchy and meticulous organization.

(163) The acts committed by Defendants are not isolated events, but represent a pattern of deceptive, fraudulent, illegal and predatory practices ongoing since approximately 1990.

(164) Defendants are associated in such a manner so as to form an ongoing organization, formal or informal, and function as a continuing unit of the RICO enterprise.

(165) The organization's hierarchy is detailed in the Background of this Complaint. The organization functions with Cleek orchestrating and meticulously structuring multiple companies and multiple individuals within the enterprise to accomplish each step or aspect of the fraudulent scheme necessary to accomplish the enterprise's ultimate objectives. Cleek devised and utilized a scheme to embezzle millions of dollars from Plaintiffs to benefit herself, her business (ARAIZA), her daughter (Carla Bean), her grandchildren (Nicolas and Kirsten Bean), her sister

38

(Gaye Lawdermilk) and her sister's business (Universal Services & Supply) to the determinant of Plaintiffs.

(166) Cleek utilized her daughter, Bean, to fraudulently notarize forged signatures on documents including POAs for UTI's owner, Mr. Rogers. The forged documents were utilized by Cleek and/or Bean to open unauthorized bank accounts wherein Plaintiffs' funds were transferred, held, and apparently left on the corporation's books for tax purposes, for years at a time until the money was embezzled and/or converted for personal use by Faye Cleek, Carla Bean, Nicolas Bean (Carla Bean's son) and Gaye Lawdermilk (Faye Cleek's sister). Cleek and/or Bean have also made questionable and/or improper payments of Plaintiffs' funds to Bean's daughter, Kirsten Bean, and Cleek's sister, Lawdermilk, through ARAIZA and Universal Services & Supply, owned by Lawdermilk. Cleek and Lawdermilk set up ARAIZA to embezzle, launder and/or funnel money to Lawdermilk and Kirsten Bean under the guise that ARAIZA was an insurance company providing insurance benefits to UTI employees.

(167) Cleek and Bean knowingly executed a scheme to defraud multiple financial institutions including, but not limited to, the following: Putnam 1st Mercantile Bank, in Cookeville, Tennessee; Citizens Community Bank in Winchester, Tennessee; Bank of Tullahoma in Tullahoma, Tennessee; First Vision Bank in Dechard, Tennessee; Regions Bank in Winchester, Tennessee; SunTrust Bank in Winchester, Tennessee; Traders National Bank in Tullahoma, Tennessee; Peoples Bank of Bedford in Shelbyville, Tennessee; American City Bank; and Franklin Country United Bank in Dechard, Tennessee.

39

(168) Cleek and/or Bean forged and fraudulently notarized Mr. Rogers' signature on various POAs that were utilized to open accounts and conduct unauthorized and/or fraudulent banking activity at Putnam 1st Mercantile Bank, Citizens Community Bank, Bank of Tullahoma, First Vision Bank, Regions Bank, SunTrust Bank, Traders National Bank, Peoples Bank of Bedford, American City Bank and Franklin County United Bank.

(169) Putnam 1st Mercantile Bank, Citizens Community Bank, Bank of Tullahoma, First Vision Bank, Regions Bank, SunTrust Bank, Traders National Bank, Peoples Bank of Bedford, American City Bank and Franklin Country United Bank are all financial institutions/banks insured by the FDIC.

(170) Based on a spreadsheet recovered from one of Bean's disc scrubbed hard drives, Cleek and Bean set up approximately 70 accounts at 13 different financial institutions, as of March 31, 2009, including accounts in both Cleek and Bean's names that were used to deposit, hold and embezzle UTI funds. The accounts were generally opened with forged POAs and Cleek and Bean forged Mr. Rogers's name on bank signature cards.

(171) Cleek and/or Bean's use of forged and fraudulently notarized POAs to open unauthorized bank accounts constitutes bank fraud and/or violations of 18 U.S.C. § 1344.

(172) Matlock signed as a witness two (2) of the forged and fraudulently notarized POAs Cleek and/or Bean used to commit bank fraud.

(173)  Bean issued Matlock two (2) checks, dated the same day, totaling $ 34,635.22, drawn from the UTI company operating account and bearing forged signatures of Mr. Rogers.

(174)  Bean forged Mr. Rogers's name on both checks totaling $ 34,635.22 issued to Matlock.  See (Exhibit 1) (Checks issued to Matlock entry and expert analysis of checks by Jane Eakes).

(175)  Mr. Rogers neither had knowledge of nor authorized the $ 34,635.22 payment to Matlock.

(176)  Cleek and Bean utilized a forged and fraudulently notarized POA, witnessed by Matlock, to open ten (10) bank accounts at Putnam 1st Mercantile Bank in Cookeville, Tennessee on or about October 2, 2008.  See (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes); (Exhibit 2) (Forged Minute Book entry and expert analysis of entries by Emily Will).  These acts constitute ten (10) separate violations of 18 U.S.C. § 1344 and constitute bank fraud.

(177)  On or about October 2, 2008, Cleek deposited ten (10) separate $ 95,000 checks drawn from the UTI company account into each of the ten (10) accounts at Putnam 1st Mercantile Bank.

(178)  Cleek signed each of the $ 95,000 checks that were deposited into the ten (10) accounts at Putnam 1st Mercantile Bank on or about October 2, 2008.

(179)  Cleek and Bean was not authorized to open the ten (10) bank accounts with UTI funds at Putnam 1st Mercantile Bank on or about October 2, 2008, and Mr. Rogers was without knowledge of these accounts until approximately September 2013.

(180)  Cleek was not authorized to sign any of the $95,000.00 checks that were deposited into the ten (10) accounts at Putnam 1st Mercantile Bank on or about October 2, 2008.  These acts constitute ten (10) instances of bank fraud, and accordingly ten (10) separate violations of 18 U.S.C. § 1344.

(181)  On or about March 7, 2009, Cleek utilized the United States Mail to transmit (8) separate checks of $ 150,000 to Putnam 1st Mercantile Bank for deposit into eight (8) of the (10) accounts opened by Cleek and Bean on or about October 2, 2008.  All (8) checks were signed by Cleek and drawn from the UTI company operating account.  This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(182)  On or about March 25, 2013, Cleek and/or Bean withdrew (based on a false representation of authorization) converted and/or embezzled approximately $ 258,707.34 from one (1) of the ten (10) bank accounts holding UTI funds that Cleek and Bean opened at Putnam 1st Mercantile Bank on or about October 2, 2008, and closed the account.  This act constituted bank fraud in violation of 18 U.S.C. § 1344.

(183)  Cleek utilized the United States Mail on June 26, 2013, to transmit checks drawn from the UTI company operating account to Putnam 1st Mercantile Bank, without authorization, for deposit into the accounts Cleek and/or Bean opened on or about October 2, 2008.  This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or furtherance of the RICO enterprise or scheme.

(184)  On or about September 23, 2013, Cleek and/or Bean withdrew, based on a false representation of authorization to the bank, converted and /or embezzled approximately $ 260,679.93 belonging to Plaintiffs from one (1) of the ten (10) bank accounts Cleek and/or Bean opened at Putnam 1st Mercantile Bank on or about October 2, 2008, and closed the account.

(185)  A spreadsheet recovered from one Bean's disc scrubbed hard-drives showed a combined balance of $ 2,158,072 for the ten (10) Putnam 1st Mercantile Bank accounts as of March 31, 2009, all of which were comprised of UTI funds.

(186)  To date, Plaintiffs have only recovered approximately $ 545,472 from the ten (10) Putnam 1st Mercantile bank accounts opened by Cleek and/or Bean on or about October 2, 2008.

(187)  Cleek and/or Bean misrepresented their authority to Putnam 1st Mercantile Bank and the bank permitted Cleek to deposit UTI funds directly into three (3) accounts opened in Cleek's name.

43

(188) Putnam 1st Mercantile Bank permitted Cleek and/or Bean to embezzle Plaintiffs' funds by permitting Cleek and/or Bean to perform unauthorized withdrawals of Plaintiffs' funds.

(189) Putnam 1st Mercantile Bank is/was exposed to risk of loss by Cleek and Bean's scheme or artifice.

(190) The three (3) accounts that Cleek opened in her own name at Putnam 1st Mercantile Bank on or about October 2, 2008, that Cleek used to hold and embezzle Plaintiffs' funds remain open.

(191) Cleek and Bean's scheme and use of the Putnam 1st Mercantile Bank accounts constituted multiple acts of Bank Fraud pursuant to 18 U.S.C. § 1344 and such acts were continuing in nature from on or about October 2, 2008, through present.

(192) Cleek sent by facsimile a POA for Mr. Rogers to the Peoples Bank of Bedford in Shelbyville, Tennessee, on September 29, 2008, to open a bank account.

(193) The POA sent by Cleek on September 29, 2008, to the Peoples Bank of Bedford was forged and fraudulently notarized. See (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes); (Exhibit 2) (Forged Minute Book entry and expert analysis of entries by Emily Will).

44

(194) Bean forged Mr. Rogers' name and notarized her own forgery of Mr. Rogers' signature on the September 24, 2008, utilized by Cleek to open an account at the Peoples Bank of Bedford on September 29, 2008. <u>See</u> (Exhibit 1) (Forged Minute Book entry and expert analysis of entries by Jane Eakes);

(195) Cleek's use of a facsimile to transmit a forged POA to the Peoples Bank of Bedford on September 29, 2008, to open an account constituted wire fraud pursuant to 18 U.S.C. § 1343 and Bank Fraud pursuant to 18 U.S.C. § 1344.

(196) On June 26, 2013, Cleek utilized the United States Mail to transmit a check, without authorization, drawn from the UTI company operating account to Peoples Bank of Bedford for deposit into the account Cleek opened on September 29, 2008. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(197) On May 26, 2011, Cleek utilized the United States Mail to transmit three (3) checks, without authorization, drawn from the UTI company operating account to The Bank of Tullahoma in Tullahoma, Tennessee, for deposit into the accounts Cleek and/or Bean opened. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(198) On June 26, 2013, Cleek utilized the United States Mail to transmit a check, without authorization, drawn from the UTI company operating account to Southern Community

Bank in Tullahoma, Tennessee, for deposit into the account Cleek and/or Bean opened. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(199) On June 26, 2013, Cleek utilized the United States Mail to transmit five (5) checks, without authorization, drawn from the UTI company operating account to Traders National Bank in Tullahoma, Tennessee, for deposit into the accounts Cleek and/or Bean opened. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(200) On June 26, 2013, Cleek utilized the United States Mail to transmit two (2) checks, without authorization, drawn from the UTI company operating account to Regions Bank in Winchester, Tennessee, for deposit into the accounts Cleek and/or Bean opened. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(201) On June 26, 2013, Cleek utilized the United States Mail to transmit two (2) checks, without authorization, drawn from the UTI company operating account to First Vision Bank of Tennessee in Decherd, Tennessee, for deposit into the accounts Cleek and/or Bean opened. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(202)  On June 26, 2013, Cleek utilized the United States Mail to transmit three (3) checks, without authorization, drawn from the UTI company operating account to Citizens Community Bank in Winchester, Tennessee, for deposit into the accounts Cleek and/or Bean opened.  This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(203)  On June 26, 2013, Cleek utilized the United States Mail to transmit a check, without authorization, drawn from the UTI company operating account to Franklin County United Bank in Dechard, Tennessee, for deposit into the accounts Cleek and/or Bean opened. This act constituted mail fraud pursuant to 18 U.S.C. § 1341 and/or was an act in the facilitation of or in furtherance of the RICO enterprise or scheme.

(204)  Putnam 1st Mercantile Bank, Citizens Community Bank, Bank of Tullahoma, First Vision Bank, Regions Bank, SunTrust Bank, Traders National Bank, Peoples Bank of Bedford, American City Bank and Franklin Country United Bank all fell prey to Cleek and Bean's scheme resulting in the various banks losing custody over Plaintiffs' money and potentially exposing the individual banks to the threat of civil liability to UTI for having succumbed to Cleek and Bean's fraudulent conduct.

(205)  Cleek and/or Bean's actions placed Putnam 1st Mercantile Bank, Citizens Community Bank, Bank of Tullahoma, First Vision Bank, Regions Bank, SunTrust Bank, Traders National Bank, Peoples Bank of Bedford, American City Bank and Franklin Country

47

United Bank at a risk of potential loss and Cleek and/or Bean's actions at each bank were part of a greater scheme to defraud Plaintiffs.

(206) Defendants' acts are arranged and ordered so as to exhibit both a relationship between the predicate acts and the threat of continuing criminal activity. Defendants' acts of mail fraud, wire fraud, bank fraud and financial fraud occurred during Defendants' acts of or facilitation of: fabricating invoices for Blue Cross Blue Shield for company records to conceal embezzlement, using forged and fraudulently notarized documents in to open unauthorized bank accounts, the use of fraudulently opened bank accounts to hold and/or conceal embezzled funds, forging or falsifying bank signatory cards, representing to a bank that they were authorized signatories, use of forged and fraudulently notarized POAs to become authorized signatories, use of the mail to transmit forged and fraudulently notarized POAs to open unauthorized accounts and use of the mail to transmit forged, unauthorized company checks to be held on deposit in unauthorized accounts at various banks to facilitate or further their scheme to embezzle money from Plaintiffs.

(207) Without Mr. Rogers's knowledge or consent, Cleek, Bean and Lawdermilk set up companies (ARAIZA and Universal Services & Supply) to operate as insurance companies providing dental and vision benefits to employees of UTI. Cards were printed and handed out to the UTI employees. Neither ARAIZA nor Universal Services & Supply are licensed insurance companies and the companies were utilized to transfer, disseminate, funnel and/or launder money embezzled from UTI.

48

(208) Prior to sending their notices of resignation via Federal Express on July 7, 2014, Cleek and/or Bean removed and/or destroyed from UTI's premises most documents, bank statements, ledgers, and check stubs relating to ARAIZA and Universal Services & Supply. An ARAIZA Merrill Lynch bank statement, however, was recovered reflecting large and/or frequent payments to Lawdermilk, Universal Services & Supply and Kirsten Bean. Such payments were not legitimate expenditures.

(209) Cleek deposited UTI funds into the ARAIZA unrelated to the "actual" premium payments or employee deductions including, but not limited to, $ 50,000 in UTI funds deposited into ARAIZA on March 17, 2008.

(210) UTI funds and payments to ARAIZA comprised of employee withholdings for dental coverage and for visions coverage were illegally, improperly and fraudulently disbursed to Lawdermilk, Universal Services & Supply and Kirsten Bean including but not limited to, the following payments to Kirsten Bean: (1) $ 400.00 on 1-2-09; (2) $ 190.00 on 2-17-09; (3) $ 640.00 on 2-18-09; (4) $ 400.00 on 3-16-09; (5) $ 400.00 on 4-8-09; (6) $ 400.00 on 5-15-09; (7) $ 600.00 on 6-17-09; (8) $ 817.50 on 7-17-09; (9) $ 412.50 on 8-28-09; (10) $ 500.00 on 9-23-09; (11) $ 400.00 on 11-9-09; and (12) $ 731.00 on 12-3-09.

(211) UTI funds and payments to ARAIZA comprised of employee withholdings for dental coverage and for visions coverage were illegally, improperly and fraudulently disbursed to Lawdermilk, Universal Services & Supply and Kirsten Bean including but not limited to, the

following payments to Gaye Lawdermilk: (1) $ 490.05 on 3-5-09; and (2) $ 1,000.00 on 12-8-09.

(212) UTI funds and payments to ARAIZA comprised of employee withholdings for dental coverage and for visions coverage were illegally, improperly and fraudulently disbursed to Lawdermilk, Universal Services & Supply and Kirsten Bean including but not limited to, the following payments to Universal Services & Supply: (1) $ 3,600.00 on 2-18-09; (2) $ 1,500.00 on 2-18-09; (3) $ 1,500.00 on 2-18-09; (4) $ 1,500.00 on 3-5-09; (5) $ 2,607.25 on4-13-09; (6) $ 1,500.00 on 4-13-09; (6) $ 1,500 on 6-9-09; (7) $ 1,500 on 6-9-09; (8) $ 1,500 on 8-27-09; (9) $ 1,500 on 8-27-09; (10) $ 1,500.00 on 10-9-09; (11) $ 1,500.00 on 12-3-09; and (12) $ 3,000.00 on 12-8-09.

(213) Defendants' actions are violations of public policy, violations of state statutes and affect interstate commerce.

(214) The nature of Defendants' predicate acts, business model and organizational structure involve a distinct threat of long-term racketeering activity that is/was continuing in nature.

(215) Defendants' enterprise has an existence that is independent to and/or separate from the pattern of racketeering activity in which it engages.

(216) All Defendants have some raison d'etre beyond mere criminality.

50

(217)  The association-in-fact enterprise in this case consists of a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

(218)  Defendants utilize the Internet, email, U.S. Mail, Federal Express, UPS, facsimile and/or the telephone to further and/or facilitate the enterprise's scheme and fraudulent/illegal conduct.

(219)  Plaintiffs have sustained and continue to sustain damages as a result of Defendants' actions and or omissions.

(220)  Plaintiffs are entitled to damages, treble damages, attorneys' fees and any other relief applicable under 18 U.S.C. § 1962(c).

## CLAIM III

### Civil RICO 18 U.S.C. § 1962(d)

### (Applicable to All Defendants)

(221)  Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (165) of this Complaint as if each were set forth separately herein.

(222)   Plaintiffs have been injured by Defendants' conspiracy to violate 18 U.S.C. § 1962(c), and Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(d) irrespective of Defendants' violation of subsection (c).

(223)   Defendants acted in concert and conspired to profit financially from defrauding Plaintiffs and multiple banks as part of its overall scheme to embezzle and/or steal money from Plaintiffs.

(224)   Defendants' scheme involved use of various companies and individuals to accomplish its overall unlawful purposes.

(225)   A civil conspiracy between the various Defendants was a vital and integral aspect to accomplishing the Defendants' unlawful purposes.

(226)   The complexity of the organizational structure, capitalization of the various companies and the method of transaction clearly reflects that each Defendant had a common purpose supported by a concerted action to defraud and/or steal money from Plaintiffs.

(227)   Each Defendant had the intent to defraud and/or steal money from Plaintiffs and that intent was common to each Defendant and each Defendant had the understanding that the other[s] had the intent to defraud and/or steal from Plaintiffs.

(228)   Plaintiffs are entitled to damages, treble damages, attorneys' fees and any other relief applicable under 18 U.S.C. § 1962(d).

## CLAIM IV

## <u>Conversion, Theft and/or Embezzlement</u>

## (Applicable to all Defendants)

(229) Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (228) of this Complaint as if each were set forth separately herein.

(230) Through the acts set forth above throughout this Complaint, each of the Defendants individually and in concert with each other appropriated Plaintiffs' funds for Defendants' own use and benefit.

(231) Through the acts set forth above throughout this Complaint, each of the Defendants individually and in concert with each other intentionally exercised dominion over Plaintiffs' funds that were stolen, converted and/or embezzled.

(232) Plaintiffs are the rightful owners of these funds. Defendants' actions constitute defiance of Plaintiffs' rights to the funds.

(233) Defendants' actions deprived Plaintiff of possession of the funds.

53

(234) Defendants' conduct was a direct and proximate cause of financial damage to Plaintiffs.

(235) Plaintiffs are entitled to damages against Defendants, jointly and severally, for Defendants' conversion of Plaintiffs' funds in an amount to be determined at trial, but expected to exceed $10 million.

(236) Plaintiffs are entitled to punitive damages for Defendants' intentional, malicious, and fraudulent conduct in converting Defendants' funds.

## CLAIM V

### Intentional Interference with Current and Prospective Business Relations

### (Applicable to Cleek, Bean and ARAIZA Company, LLC)

(237) Plaintiffs adopt, reiterate, re-allege and incorporate by reference each and every allegation set forth in paragraphs (1) through (236) as though fully set forth herein.

(238) Plaintiffs have current and prospective business relationships with identifiable third-parties, including various defense industry entities, contractors, businesses and/or governmental entities with whom Plaintiffs have conducted business on a long term basis. Plaintiffs expended considerable time and resources developing and cultivating current and prospective business relationships with these third-parties.

54

(239)  Plaintiffs have an expectation of continued business relations with these third-parties.

(240)  Plaintiffs have expended time, money, and resources in developing relationships with these businesses and creating goodwill.

(241)  Plaintiffs have developed proprietary designs, proprietary compounds, proprietary processes and component parts that are built in-house or outsourced to other companies including, but not limited to, casting companies that utilize Plaintiffs' proprietary designs and patterns when casting component parts.  Cleek and Bean have knowledge of and have taken this information from Plaintiffs and this information can be used by Cleek and Bean to gain an unfair advantage.

(242)  Plaintiffs have developed pricing structures, costs structures, customer lists, vendor lists and supplier lists that constitute confidential and proprietary information.  Cleek and Bean have knowledge of and have taken this information from Plaintiffs and this information can be used by Cleek and Bean to gain an unfair advantage.

(243)  Certain proprietary designs, processes, materials and methods possessed by Plaintiffs related were the product of a culmination of many years of design, work, extensive testing at a significant cost and derived from thousands of man hours including, but not limited to, an approximately six (6) year process in which it took to develop a specific rubber compound capable of meeting requirements of the defense industry.

(243) Cleek and Bean have specific, actual and/or constructive knowledge of Plaintiffs' current and/or prospective business relationships, expectancies, and opportunities. Cleek and Bean's knowledge of these companies/entities that are customers of Plaintiffs and their relationships with these companies/entities have been cultivated over time while Cleek and Bean worked at UTI. Cleek and Bean worked in the front office, communicated directly with the customers and handled customer pricing and contracts, ordering, accounts payable, accounts receivable and completing compliance forms or forms mandated by government entities that were customers of Plaintiffs.

(244) Cleek, as the former Secretary and Treasurer, of UTI possesses knowledge of confidential and proprietary information relating to Plaintiffs' manner of pricing, manner of contracting, customer lists, and preferred modes of servicing each of UTI's customers and, therefore, owes a fiduciary duty to Plaintiffs.

(245) Cleek is exploiting UTI information she obtained while serving as Secretary and Treasurer and office manager of UTI as a means of gaining an unfair advantage and competing with Plaintiffs in breach of her fiduciary duties owed to Plaintiffs.

(246) Prior to leaving UTI, Cleek and Bean removed/retained company computers and removed/retained company files from UTI's premises containing confidential information and proprietary information including, but not limited to: proprietary designs, proprietary compounds, proprietary processes, sensitive customer information, customer pricing, customer product specifications, internal, external and fixed costs, vendor list, vendor pricing/costs,

56

supplier lists, supplier pricing and costs and preferred modes of servicing each of Plaintiffs'
customers.

(247)  Cleek and/or Bean removed and/or retained sensitive customer information,
confidential information and proprietary information from UTI's offices to interrupt or interfere
with Plaintiffs' operation, business, ability to serve its clients and to gain an unfair advantage in
interfering with Plaintiffs' business or taking Plaintiffs' customers.

(248)  On July 8, 2014, Cleek and Bean registered ARAIZA as Domestic Limited
Liability Company in Tennessee with Bean serving as the registered agent for the company.

(249)  Cleek and Bean's July 8, 2014, registration of ARAIZA occurred one (1) day after
the July 7, 2014, date on their resignation notices sent to UTI by Fed Ex.

(250)  ARAIZA is now known as ARAIZA Company, LLC.

(251)  Cleek owns, operates, manages and/or controls (in whole or in part) ARAIZA
Company, LLC.

(252)  Bean owns, operates, manages and/or controls (in whole or in part) ARAIZA
Company, LLC., and/or has a financial stake or interest in ARAIZA Company, LLC.

(253) On July 12, 2014, Cleek, Bean and ARAIZA Company, LLC, obtained a Commercial and Government Entity ("CAGE") code through Defense Logistic Agency.

(254) The CAGE Code in a unique identifier that permits Cleek, Bean and ARAIZA Company, LLC, to contract with, supply or perform services for government defense agencies in direct competition with UTI.

(255) The CAGE Code Information system list Bean as the Point of Contact for ARAIZA Company, LLC.

(256) Bean and Cleek registered ARAIZA Company, LLC, with the primary supplier data base for the U.S. Government known as System for Award Management ("SAM").

(257) The CAGE Code and registration with SAM permits Cleek, Bean and ARAIZA Company, LLC, to bid on UTI's current contracts and to compete directly with Plaintiffs.

(258) ARAIZA Company, LLC was formed in order to unfairly compete with UTI.

(259) Since 1996, UTI has supplied the military with component parts for Plastic Waste Processing Units ("PWPs") used for recycling refuse on large naval vessels while the vessels are at sea for extended periods of time.

(260)  A portion of the PWPs' component parts were designed by UTI and are proprietary designs of UTI, but are made through a casting process and outsourced to casting companies/vendors for UTI.

(261)  Cleek and Bean know the casting companies used by UTI, know the designs, know the specifications for the designs, know the processes, know UTI's costs and know UTI's pricing for the PWP component parts.

(262)  UTI's designs, specifications, processes, costs, and pricing are confidential and are known only to Cleek and Bean through their former positions of trust at UTI.

(263)  UTI supplied a component part for the PWP known as a RAM Assembly since approximately 1996.

(264)  Upon leaving UTI in July of 2014, Cleek and Bean obtained their CAGE code, obtained their SAM registration, contacted UTI's casting company vendor for pricing and availability of the RAM Assembly, underbid UTI's price and obtained a contract to supply the RAM Assembly to the military in direct competition with UTI.

(265)  On or about July 24, 2014, ARAIZA contacted Varicast in an effort to obtain delivery of another proprietary component part of the PWP (Bottom Tank) that UTI has supplied to the military since 1996.

(266)  Varicast is a casting company vendor utilized by UTI to cast propriety component parts designed by UTI.

(267)  The PWP Bottom Tank is cast by Varicast, but was designed by UTI and is a proprietary design and/or pattern belonging to UTI.

(268)  Cleek and Bean know the designs, know the processes, know UTI's costs and know UTI's pricing regarding the RAM Assembly and Bottom Tank for PWPs.

(269)  Cleek, Bean and ARAIZA Company, LLC, are attempting to exploit their relationship with UTI customers and vendors and utilize the confidential and proprietary information they removed and retained from UTI's premises to compete with and interfere with Plaintiffs' business.  Cleek and Bean also embezzled millions of dollars from Plaintiffs that can be utilized as start-up capital for the competing business.  Upon information and belief, Cleek and/or Bean have approached employees at UTI about working for their competing company.

(270)  Cleek, Bean and ARAIZA Company, LLC, intend to cause the breach of, termination of or interfere with the business relationships Plaintiffs enjoy with its customers. Cleek, Bean and ARAIZA Company, LLC, intended to and/or did deny Plaintiffs of their contractual rights.

60

(271)  Cleek, Bean and ARAIZA Company, LLC's, interference with Plaintiffs' business and/or contractual relations is designed to injure Plaintiffs while benefitting Cleek, Bean and ARAIZA Company, LLC.

(272)  Cleek, Bean and ARAIZA Company, LLC's, motive for interference and their means of interference are improper and include, but are not limited to:  theft of company records and documents, theft of company assets, theft of company money that can be used as start-up capital, the use of fraud and forgery to embezzle UTI funds from various bank accounts, use of confidential and proprietary information and breach of fiduciary duties and obligations.

(273)  Cleek, Bean and ARAIZA Company, LLC, have an improper motive and/or utilized improper means for interference with Plaintiffs' business or intending to cause the breach or termination of business relationships between Plaintiffs' customers and the Plaintiffs. Cleek, Bean and ARAIZA Company, LLC's, predominate purpose was to defraud and/or cause harm to Plaintiffs, put Plaintiffs out of business and interfere with Plaintiffs' business relationships for purposes of financial gain to Cleek, Bean and ARAIZA Company, LLC.

(274)  Cleek, Bean and ARAIZA Company, LLC, acted willfully in damaging Plaintiffs' business, embezzling money from Plaintiffs and in removing and/or retaining company computers and company files from UTI's premises containing sensitive customer information, confidential information and proprietary information.  These actions constitute intentional and wrongful interference with current or prospective business and/or impact potential future business.

61

(275)  Cleek, Bean and ARAIZA Company, LLC's, actions, interference and/or intended interference with Plaintiffs' business are intentional, willful and malicious.

(276)  Cleek, Bean and ARAIZA Company, LLC's, interference involves deceit, fraud, undue influence, misuse of inside information, breach of fiduciary relationships, overreaching conduct, and constitutes unfair competition.

(277)  Plaintiffs have suffered damage and significant harm and/or will suffer irreparable harm as a direct and proximate result of Cleek, Bean and ARAIZA Company, LLC's, actions and current or intended tortious interference with the business relations between Plaintiffs and Plaintiffs' customers.

(278)  Plaintiffs are entitled to damages against Cleek, Bean and ARAIZA Company, LLC, jointly and severally, in an amount to be determined at trial.

(279)  Plaintiffs are entitled to an Order directing Cleek, Bean and ARAIZA Company, LLC, to return all company property, company computers, company data, company files, company records, customer files, customer records and/or any documents or electronically stored information relating to or referencing any of Plaintiffs' customers and vendors and should be prohibited from contacting those customers and vendors in an effort to interfere with Plaintiffs' business.

(280)  Plaintiffs are entitled to punitive damages for Cleek, Bean and ARAIZA

Company, LLC's, intentional, malicious, and fraudulent conduct in interfering with the business

relations between Plaintiffs and Plaintiffs' customers.


## CLAIM VI

## Computer Fraud and Abuse Act, 18 U.S.C. 1030(g)

### (Applicable to Cleek and Bean)


(281)  Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every

allegation contained in ¶¶ (1) through (280) of this Complaint as if each were set forth separately

herein.


(282)  Cleek and/or Bean deleted important files and other computer data on at least four

(4) UTI company computers to conceal the nature and extent of their embezzlement.


(283)  Neither Cleek or Bean had authorization to access the computers in question for

such purposes and exceeded their authorized access.


(284)  Cleek and/or Bean's access to the computers in question violated their duty of

loyalty to Plaintiffs.


(285)  For instance, forensic computer examination revealed that Cleek and/or Bean

utilized the DriveScrubber program between 9:33 a.m. and 12:29 p.m. on Thursday, July 3,

2014, on a UTI company computer referred to as "Carla I." Thursday, July 3, 2014, was the last

day Cleek and Bean worked at UTI and UTI received Cleek and Bean's written notice of resignations by Federal Express dated and/or on Monday, July 7, 2014.

(286) Cleek and/or Bean used DriveScrubber on the following UTI computers to delete and/or destroy company data, payroll, book keeping, insurance, and financial records on the following computers: (1) "Carla I" containing two (2) hard drives; (2) "Carla II" containing one (1) hard drive; (3) "Payroll" containing two (2) hard drives; and (4) "Insurance" containing two (2) hard drives.

(287) The UTI computer labeled "Insurance" was apparently utilized to operate UTI's Peachtree Accounting Software program and forensic accountants are currently undertaking efforts to recover, restore and access the information deleted from this computer.

(288) Cleek and/or Bean removed and retained at least four (4) laptop computers belonging to UTI that were utilized for payroll, accounting and book-keeping purposes and that also contained confidential and proprietary information relating to UTI customers including confidential customer information, vendors, cost structure, customer pricing, design specifications related to proprietary products and information related to proprietary processes and compounds.

(289) Cleek and/or Bean removed and/or retained at least four (4) laptops containing sensitive customer information, confidential information and proprietary information from UTI's

offices to interfere with Plaintiffs' business and to gain an unfair advantage in interfering with Plaintiffs' business or taking Plaintiffs' customers.

(290)  Cleek and/or Bean wrongfully, intentionally, knowingly, and/or with intent to defraud, accessed computers and files belonging to UTI.

(291)  The UTI computers were used in interstate commerce by virtue of being connected to the Internet and were "protected" under the Computer Fraud and Abuse Act ("CFAA").  These computers were used to further UTI's interstate business.

(292)  Cleek and/or Bean exceeded their authorized use of UTI's computers by deleting files and other data and copying and taking confidential and proprietary information in computer files for the purpose of competing with or otherwise harming UTI.

(293) Cleek and/or Bean's actions recklessly caused damage to Plaintiffs.

(294)  Cleek and/or Bean deleted data, took data from UTI's protected computers and/or or took UTI computers in order to damage UTI's business and to cover up their other wrongdoing in this case, including but not limited to their theft of UTI funds, and to gain an unfair competitive advantage in competing with Plaintiffs.

(295)  Cleeka and/or Bean acted intentionally in accessing the four computers.

65

(296) UTI has suffered loss and damage in excess of $5,000, which includes the costs of conducting a damage assessment and restoring files and data to the condition prior to Defendants' actions as a direct and proximate result of Cleek and Bean's unauthorized access of UTI's protected computers, deletion of computer files and other data and the physical theft of at least four (4) computer laptops.

**CLAIM VII**

**Breach of Fiduciary Duty and Duty of Loyalty**

**(Applicable to Cleek and Bean)**

(297) Plaintiffs adopt, reiterate , incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (296) of this Complaint as if each were set forth separately herein.

(298) Cleek as an officer and/or as the Secretary-Treasurer of UTI owed a fiduciary duty, fiduciary obligation and/or a fiduciary duty of loyalty to Plaintiffs.

(299) Cleek and Bean owed Plaintiffs a fiduciary duty of loyalty as Cleek and Bean were entrusted by Plaintiffs to handle Plaintiffs' money, financial records, payroll, accounts payable, accounts receivable, employee benefits (life, health, dental and vision) and they calculated and provided all line item entries and/or financial information to an accounting firm for preparation of both UTI and Mr. Rogers' taxes.

(300)  Cleek and Bean owed Plaintiffs a duty to act in the interests of Plaintiffs and not for their own benefit to the detriment of Plaintiffs.

(301)  Cleek and Bean breached their fiduciary duties and/or obligations owed to Plaintiffs by taking the various intentional and wrongful actions described throughout this Complaint, which actions benefitted them personally to the detriment of Plaintiffs.

(302)  Plaintiffs sustained damages and as a direct and proximate result of Cleek and Bean's breach of their fiduciary duties and/or obligations.

(303)  Plaintiffs experienced a loss as the direct and proximate result of Defendants actions including response costs such as damage assessments and restoration costs.

(304)  Plaintiffs are entitled to damages, costs, attorneys' fees and a disgorgement of any ill-gotten profits or gains.

## CLAIM VIII

## Breach of Fiduciary Duty Under the Employee Retirement Income Security Act of 1974

## (ERISA), 29 U.S.C. § 1001, et seq.

## (Applicable to All Defendants)

(305)    Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (306) of this Complaint as if each were set forth separately herein.

(306)    UTI established an employee benefit plan (the "Plan") to provide dental and vision benefits to its employees under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.

(307)    UTI hired ARAIZA, a company established and owned by Cleek and Bean, to administer the Plan funds and to pay medical providers for claims incurred under the Plan.

(308)    As administrator of the Plan, ARAIZA was obligated to administer and use the funds received from UTI and its employees solely for the purpose of paying employee vision and dental claims.

(309)    In its role as administrator of the Plan, ARAIZA, and by extension Cleek and Bean, exercised discretionary control over management of the Plan, and exercised authority and/or control over disposition of the Plan funds, such as where the funds were deposited and how and when they were disbursed.

(310)    Based on its duties as administrator, ARAIZA, and by extension Cleek and Bean, was a fiduciary of the Plan under ERISA, 29 U.S.C. § 1002(21)(A).

(311)   Cleek and Bean commingled Plan dental and vision funds with each other in the same ARAIZA account, and further commingled those Plan funds with other UTI funds and personal funds in that same ARAIZA account.

(312)   Upon information and belief, ARAIZA, Cleek, and Bean misappropriated and used Plan funds for their own interest and purposes and for the personal benefit of Cleek, Bean, and others associated with them, including Defendants Lawdermilk and Universal Services & Supply, which uses were not for the benefit or in the interest of the Plan, UTI, or UTI employees.

(313)   Accordingly, ARAIZA, Cleek, and Bean breached their fiduciary duties to the Plan under ERISA, 29 U.S.C. §§ 1104(a)(1), 1106(a)(1), and 1106(b)(1).

(314)   As a result of ARAIZA, Cleek, and Bean's breach of their fiduciary duties under ERISA, UTI has suffered and is entitled to recover damages on behalf of the Plan under 29 U.S.C. §§ 1109(a) and 1132(a)(2) in the form of losses to the Plan, profits obtained by ARAIZA, Cleek, and Bean, and other remedial relief as the court may deem appropriate, in an amount to be determined at trial, but expected to exceed $ 100,000.

(315)   In addition to damages, UTI is entitled to an injunction against ARAIZA, Cleek, and Bean pursuant to 29 U.S.C. § 1132(a)(3)(A) to prohibit any further misappropriation of Plan funds, and all appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

(316)   UTI further requests an accounting of the amount of Plan funds ARAIZA, Cleek, and/or Bean retained or transferred for their own benefit or for the benefit of Cleek's and/or

69

Bean's family members (and to the detriment of the Plan), and of the profits earned by ARAIZA, Cleek, and/or Bean through the breach of their fiduciary duties under ERISA.

## CLAIM VIII

### Fraud

### (Applicable to Cleek and Bean)

(317)  Plaintiffs adopt, reiterate , incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (316) of this Complaint as if each were set forth separately herein.

(318)  Cleek and/or Bean removed and/or destroyed payroll records with the exception of Bean's pay stubs from January 18, 2013, through May 10, 2013, that were inadvertently left behind and reflect the following payroll fraud:

(1)  Bean made material and intentional misrepresentations of fact to UTI regarding the amount of overtime and/or hours she worked by falsely representing to UTI that she worked and should be compensated for:

   (a)  32.50 hours of overtime on May 10, 2013.  (Exhibit 11);

   (b)  62.50 hours of overtime on April 19, 2013.  (Exhibit 2);

   (c)  62.50 hours of overtime on April 12, 2013.  (Exhibit 13);

   (d)  82.00 hours of overtime on April 5, 2013.  (Exhibit 9);

   (e)  56.00 hours of overtime on March 28, 2013.  (Exhibit 14);

70

(f) 48.50 hours of overtime on March 22, 2013. (Exhibit 15);

(g) 58.75 hours of overtime on March 15, 2013. (Exhibit 16);

(h) 42.00 hours of overtime on March 8, 2013. (Exhibit 17);

(i) 36.50 hours of overtime on February 15, 2013. (Exhibit 6); and

(j) 29.75 hours of overtime on January 25, 2013. (Exhibit 3).


(2) Bean made material and intentional misrepresentations of fact to UTI regarding the amount of Vacation time she had accrued and/or falsely represented to UTI that she was entitled to receive vacation pay in the amount of:

(a) $ 29,435 on February 1, 2013 for 1015 hours of vacation. (Exhibit 4);

(b) $ 2,320 on February 8, 2013 for 80 hours of vacation. (Exhibit 5);

(b) $ 696 on February 22, 2013 for 24 hours of vacation. (Exhibit 7);

(d) $ 28,971 on March 1, 2013 for 999 hours of vacation. (Exhibit 8);

(e) $ 28,971 on April 5, 2013 for 999 hours of vacation. (Exhibit 9); and

(f) $ 26,100 on April 26, 2013 for 900 hours of vacation. (Exhibit 10).

Bean knew she did not work the above overtime hours and knew that she was not entitled to receive the above vacation pay she submitted to UTI for payment. UTI reasonably relied, to its detriment, upon Bean's misrepresentations that Bean worked the above overtime hours and that she was entitled to receive the above pay when it paid Bean such pay that she did not earn.

(319)  Plaintiff received records from the Tennessee Unemployment Compensation office regarding reported income by Bean that reflect a long term pattern of payroll fraud consistent with the fraud described in Paragraph (318).

(320)  Bean was compensated at $ 29.00 per hour by UTI, but reported yearly wages, for purposes of Tennessee Unemployment Compensation reporting requirement, as follows (1)  $ 137,204.69 for 2007; (2)  $ 153,962.08 for 2008; (3)  $ 252,673.07 for 2009; (4)  $ 237,295.72 for 2010; (5)  $ 273,509.00 for 2011; (6)  $ 261,609.40 for 2012; (7)  $ 366,357.95 for 2013. UTI reasonably relied, to its detriment, upon Bean's intentional misrepresentations that Bean was entitled to receive pay above and beyond $ 29.00 per hour for hours actually worked.

(321)  Cleek's June 29, 2014, paystub reflects that UTI paid her $ 710,021.41 representing approximately 3,718 hours of work and 4,000 hours of vacation and holiday pay during a six (6) month period of time based on Cleek's intentional misrepresentations to UTI that she worked and/or was entitled to the following compensation:

(1)  $ 108,180 equating to 30 weeks of salary for 26 weeks of work.  (Exhibit # 19);

(1)  $ 90,149.10 for "Regular" pay based on Cleek's misrepresentation that she worked and/or was entitled to 1,000 hours of pay at $ 90 per hour.  (Exhibit 19);

(2)  $ 270,268.80 for vacation pay based on Cleek's misrepresentation that she was entitled to 3,000 hours of vacation at $ 90 per hour.  (Exhibit # 13);

(3)  $ 90,149,10 for holiday pay based on Cleek's misrepresentation that she was entitled to approximately 1,000 hours of holiday pay at $ 90 per hour.  (Exhibit # 13);

(4) $ 90,149.10 based on Cleek's misrepresentation that she worked 1,000 hours in "Molding and Heat Treating." Cleek never worked in the "Molding and Heat Treating" shop. (Exhibit # 13).

(5) $ 61,125.31 based on Cleek's misrepresentation that she worked 678 hours in "Sand Blasting and Forging." Cleek never worked in the "Sand Blasting and Forging" shop. (Exhibit # 13).

Cleek knew that the above information she submitted to UTI for payroll or compensation was false. UTI reasonably relied, to its detriment, upon Cleek's misrepresentations that Cleek worked and/or was entitled to receive the above compensation, when it paid Cleek such pay that she did not earn.

(322) Cleek intentionally misrepresented to UTI that she worked and was entitled to receive the following compensation amounts: (1) $ 322,285.55 on June 27, 2014; (2) $ 70,979.41 on June 27, 2014; (3) $ 70,044.45 on June 27, 2014; (4) $ 48,482.86 on June 2, 2014; and (5) $ 45,792.92 on June 2, 2014. UTI reasonably relied, to its detriment, upon Cleek's intentional misrepresentations that Cleek was entitled to receive the above compensation when it paid her these amounts that were not earned.

(323) Cleek received an annual salary of $ 187,500 from UTI, but reported yearly wages, for purposes of Tennessee Unemployment Compensation reporting requirement, as follows: (1) $ 206,262.00 for 2007; (2) $ 242,602.00 for 2008; (3) $ 249,912.00 for 2009; (4) $ 191,118.00 for 2010; (5) $ 224,436.00 for 2011; (6) $ 219,966.00 for 2012; and (7) $ 227,148 for 2013. UTI reasonably relied, to its detriment, upon Cleek's intentional misrepresentations that Cleek was entitled to receive pay above and beyond her salary of $ 187,500 when it paid her amounts that were not earned.

73

(324)  Cleek and Bean were specifically instructed on about January 6, 2014 not to sign checks and that Mr Rogers would sign all company checks from January 6, 2014, forward.

(325)  Cleek and Bean intentionally misrepresented to Mr. Rogers each and every payroll day from January 6, 2014, to June 29, 2014, that Cleek and Bean were presenting all payroll checks for all amounts payable to Mr. Rogers for his signature.

(326)  On each and every payroll day from January 6, 2014, to June 29, 2014, Cleek and Bean concealed from Mr. Rogers that they were still writing and signing company checks payable to themselves and to Bean's son, Nicolas Bean, for unauthorized wages and/or amounts they were not entitled to receive.

(327)  Mr. Rogers reasonably relied, to his and UTI's detriment, on Cleek and Bean's misrepresentations on each and every payroll day from January 6, 2014, to June 29, 2014, that Cleek and Bean were presenting all payroll checks for all amounts payable to Mr. Rogers for his signature when Cleek and Bean were not presenting all checks to Mr. Rogers including company checks payable to themselves and Bean's son, Nicholas Bean.

(328)  Mr. Rogers' and UTI's reasonable reliance upon Cleek and Bean's misrepresentations related to payroll and/or described in Paragraphs (318) through (327) and in the Background section of this Complaint resulted in damages to Plaintiffs in the form of

excessive, unearned payments to Cleek, Bean and Nicholas Bean for wages and/or monies they did not earn and were not entitled to receive.

(329)  On October 2, 2008, Cleek and/or Bean intentionally misrepresented their authority to Putnam 1st Mercantile Bank and the bank permitted Cleek and/or Bean to open unauthorized accounts and deposit UTI funds.

(330)  Putnam 1st Mercantile Bank relied upon Cleek and Bean's representations and permitted Cleek and/or Bean to embezzle Plaintiffs' funds by allowing Cleek and/or Bean to perform unauthorized withdrawals.

(331)  On or about March 25, 2013, Cleek and/or Bean withdrew, converted and/or embezzled approximately $ 258,707.34 of UTI's money from an account Cleek and/or Bean opened at Putnam 1st Mercantile Bank on October 2, 2008, through use of a forged POA.

(332)   On or about September 23, 2013, Cleek and/or Bean withdrew, converted and /or embezzled approximately $ 260,679.93 of UTI's funds from an account Cleek and/or Bean opened at Putnam 1st Mercantile Bank on October 2, 2008.

(333)  On or about June 19, 2014, Cleek withdrew $ 320,081.56 belonging to Plaintiffs from Regions Bank and closed the account.  Cleek had previously withdrawn, by cashier's check, $ 300,000 belonging to Plaintiffs from this same account on August 28, 2013.

(334) Putnam 1st Mercantile Bank, Citizens Community Bank, Bank of Tullahoma, First Vision Bank, Regions Bank, Suntrust Bank, Traders National Bank, Peoples Bank of Bedford, American City Bank and Franklin Country United Bank all fell prey to Cleek and Bean's scheme resulting in the various banks losing custody over Plaintiffs' money.

(335) Cleek and/or Beans misrepresentations to Putnam 1st Mercantile Bank, Citizens Community Bank, Bank of Tullahoma, First Vision Bank, Regions Bank, Suntrust Bank, Traders National Bank, Peoples Bank of Bedford, American City Bank and Franklin Country United Bank were to facts in existence at the time the misrepresentations were made.

(336) Cleek and/or Bean's misrepresentations were made with knowledge of their falsity and with a fraudulent intent.

(337) Cleek and/or Bean purposefully made these misrepresentations in order to defraud both the banks and the Plaintiffs and/or victimize Plaintiffs through Cleek and Bean's fraudulent acts utilized to gain financial benefits and/or steal money from Plaintiffs.

(338) Reliance upon Cleek and Bean's misrepresentations was reasonable.

(339) Third-Parties, including financial institutions, reasonably relied on Cleek and Bean's misrepresentations that resulted in financial harm to Plaintiffs.

(340) Cleek and Bean's misrepresentations caused or induced third-parties, including financial institutions, to accept forged and fraudulently notarized powers of attorney, forged financial instruments, forged signature cards and to accept fraudulent misrepresentations by Cleek and/or Bean regarding their authority to open bank accounts in Plaintiffs' names and in their own names and to utilize those bank accounts to surreptitiously deposit and hold funds embezzled from Plaintiffs for Cleek and/or Bean's own personal use and benefit and without Plaintiffs' knowledge or authorization.

(341) Cleek and Bean's in this regard is the direct and proximate cause of financial damage to Plaintiffs.

(342) Plaintiffs are entitled to damages against Cleek and Bean, jointly and severally, in an amount to be determined at trial.

(343) Plaintiffs are entitled to their reasonable costs and attorney's fees.

(344) Plaintiffs are entitled to punitive damages for their intentional, malicious, and fraudulent conduct.

### CLAIM IX

### Civil Conspiracy

### (Applicable to All Defendants)

(345)  Plaintiffs adopt, reiterate, incorporate by reference and re-allege each and every allegation contained in ¶¶ (1) through (344) of this Complaint as if each were set forth separately herein.

(346)  Defendants have a common design and purpose of embezzling funds belonging to Plaintiffs.

(347)  Defendants have acted in concert with an unlawful purpose, and with unlawful means, to interfere with Plaintiffs' business relations and to induce Plaintiffs' customers to breach their contractual agreements.

(348)  Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to embezzle, convert and/or steal money belonging to Plaintiffs.

(349)  Plaintiffs have sustained damages as a direct and proximate result of Defendants' unlawful conspiracy.  These damages include loss of profits and damage to and loss of UTI's goodwill.

(350)  Defendants' actions are a direct and proximate cause and cause in fact of significant harm to Plaintiffs.

(351)  Defendants are jointly and severally liable to Plaintiffs for damages in an amount to be determined at trial.

(352)  Defendants acted intentionally, willfully and with malice in taking these actions.

(353)  Plaintiffs are entitled to punitive damages for their intentional, malicious, and fraudulent conduct.

## PRAYER FOR RELIEF

Wherefore, premises considered, Mr. Rogers and UTI respectfully requests as follows:

(1)  That process be issued and that the defendants be required to answer;

(2)  A Declaration that Mr. Rogers' signatures on the corporate minute book entries purporting to give Cleek twenty-five (25 %) percent of UTI were forged signatures and that Mr. Rogers is the sole owner and sole 100 % shareholder of UTI;

(3)  That UTI be awarded judgment in the amount shown at trial but not less than ten-million ($ 10,000,000.00) dollars plus pre-judgment interest;

(5)  That UTI be awarded punitive damages in an amount of no less than twenty-million ($ 20,000,000.00) dollars;

(3)  That Mr. Rogers be awarded judgment in the amount shown at trial but not less than ten-million ($ 10,000,000.00) dollars plus pre-judgment interest;

(5)  That Mr. Rogers be awarded punitive damages in an amount of no less than twenty-million ($ 20,000,000.00) dollars;

79

(4)  That all Plaintiffs be awarded all reasonable attorneys' fees;

(3)  That Plaintiffs be awarded damages related to the loss of goodwill and the resulting substantial harm to Plaintiffs;

(4)  That Plaintiffs be awarded compensation for loss of future profits and future business opportunities;

(5)  That Plaintiffs be awarded costs, losses, and fees related to the substantial resources needed to address Defendants' willful and malicious actions and related efforts to mitigate damage to Plaintiffs' business resulting from Defendants' actions and destruction of or removal of Plaintiffs' records, computers, computer hard drives, files and financials;

(7)  That Defendants be disgorged of ill-gotten gains or profits and that these amounts be awarded to Plaintiffs as damages;

(8)  That Plaintiffs be awarded treble damages against all Defendants;

(9)  That Plaintiffs be awarded all reasonable costs, expert costs and expenses;

(10)  That this Court issue, after a hearing, a temporary restraining order and/or a preliminary injunction, and after trial a permanent injunction restraining and enjoining Defendants or their agents and/or employees from:

(a)  using, spending or transferring any UTI funds currently in the possession of Cleek and/or Bean or in any bank accounts opened by Cleek and/or Bean, maintained by Cleek and Bean or any account having Cleek and/or Bean's name on the account.  Plaintiffs request that any such bank accounts be frozen and that the money be returned to Plaintiffs with interest;

(b)  using Plaintiffs' confidential and proprietary information removed from UTI's premises including all documents, files, and electronically stored data on the computers Cleek and Bean removed and retained from UTI's premises. Plaintiffs request that this Court enter an Order prohibiting Cleek and Bean from destroying any UTI files in their possession and/or destroying or deleting any data on the UTI company computers in their possession and that the Court Order the same be returned to Plaintiff;

(c)  using any of Plaintiffs' proprietary designs, proprietary compounds or proprietary processes;

(d)  retaining, using, erasing, destroying and/or altering the all UTI computer[s] and/or laptop computer[s] in Defendants' possession including, but not limited to: (1) Dell Studio 15 Notebook (Studio 1555) purchased on 12-15-09; (2) Dell Studio XPS 1640 Notebook purchased on 12-15-09; (3) Sony Laptop purchased on 12-20-06; and (4) Sony Laptop purchased on 12-20-06.  Plaintiffs further request that this Court direct Defendants to immediately return the above reference computers to Plaintiffs;

(e)  contacting any of Plaintiffs' vendors or customers for the purpose of interfering with or competing with Plaintiffs' business; and

(f)  attempting to delete, modify, alter, or otherwise destroy, intentionally, inadvertently, or automatically, any potentially discoverable and/or relevant information located on any business operated servers, laptops or other computers, cellular phones, handheld devices (i.e., iPhones, Blackberries, or similar devices), personal computers, or any other devices capable of storing electronic information.

(11)  That Plaintiffs be awarded pre- and post- judgment interest on any award of damages to the fullest extent allowed by law;

(12)  That the costs of this cause be assessed against the defendants;

81

(13)   That Plaintiffs be granted such other general relief which this Court may deem appropriate; and

(13)   That Plaintiffs be granted such other and further relief, both legal and equitable as may be proper.

(14)   That this cause of action be tried before a jury

Respectfully Submitted

KING & BALLOW

By: _____
R. Eddie Wayland, BPR 6045
R. Douglas Hanson, II, BPR 017387
Patrick W. Ogilvy, BPR 25615
rew@kingballow.com
dhanson@kingballow.com
pogilvy@kingballow.com

Attorneys for  Universal Technologies, Inc.,
and Jesse E. Rogers
315 Union Street, Suite 1100
Nashville, TN  37201
Tel: (615) 259-3456
Fax: 888-688-0482